[No. 32312-1-I.    Division One.    June 13, 1994.]

CAR WASH ENTERPRISES, INC., *Respondent,* v. EDWARD
G. KAMPANOS, ET AL, *Appellants.*

538

*John R. Christiansen* and *Weiss, Jensen, Ellis & Botteri,* for appellants.

*Robert B. Gould* and *Law Office of Robert B. Gould,* for respondent.

*Harry E. Grant* and *Caitlin J. Moughon* on behalf of Washington Environmental Council, amicus curiae.

*Mark W. Schneider* and *Thomas Kellenberg* on behalf of Washington Public Ports Association, Weyerhaeuser Company, Association of Washington Business, Puget Sound Power and Light Company, and the Boeing Company, amici curiae.

*Christine O. Gregoire, Attorney General,* and *William B. Collins, Senior Assistant,* on behalf of the State, amicus curiae.

PEKELIS, A.C.J. — Edward G. and Virginia P. Kampanos (Kampanos) appeal the trial court's contribution award to Car Wash Enterprises, Inc. (Car Wash).

In January 1986, Car Wash purchased certain real property (hereinafter the property), located in Seattle, Washington, from Kampanos. Kampanos had acquired the property in 1971 from Edward's father, Sam Kampanos. From at least 1971 to 1978, a service station was operated on the property.[1] From 1978 to 1986, a lessee manufactured truck tailgates and sold halide lights on the property.

Victor Odermat (Odermat) is the sole shareholder and president of Car Wash, which has done business as Brown Bear Car Wash since 1957. Odermat, who has sole responsibility for acquiring Car Wash properties, visited the property only once prior to acquiring it. Sometime in the late summer or early fall of 1985, Odermat entered into negotiations with Howard Breskin (Breskin), Kampanos' attorney, to purchase the property.

At the time of the negotiations, Odermat knew of the halide light sales operation on the property. Although a service station was not then in operation, he was aware that the building on the property "looked like a metal service-station building". However, Odermat did not inquire about previous uses because it "never occurred" to him. According to Odermat, neither Kampanos nor Breskin informed him of the property's previous uses. In addition, Odermat had not yet begun the practice of soil testing potential Car Wash sites for contaminants.

Breskin drafted the real estate purchase and sale agreement in its entirety, which was executed by Kampanos on September 27, 1985, and by Car Wash on December 4, 1985. The sole provision relating to the condition of the property provided:

5. CONDITION OF PROPERTY. Purchaser has examined the Property and all improvements thereon, and accept [sic] the same as is and in present condition.

---

[1]From 1971 to 1976, Sam Kampanos either operated or leased the property for this purpose. From 1976 to 1978, Fletcher Oil Company leased the property for this purpose.

Approximately 2 weeks before the sale was scheduled to close on January 17, 1986, Odermat learned of underground tanks on the property. Odermat contacted Breskin about the possibility of reducing the purchase price to account for the cost of tank removal. However, no agreement was reached, and the sale closed as planned.

Following the closing, sometime in early 1986, Car Wash removed the underground tanks from the property. At that time, "the smell of hydrocarbons or gasoline" was noticeable. One tank had a hole in it. However, because there were no reporting or cleanup requirements in effect at that time, Car Wash simply filled the hole. Car Wash never made use of the property.

In 1990, as underground tanks were being removed from another Car Wash property, Odermat smelled gasoline. The smell of gasoline reminded him of the smell he had noticed when the underground tanks were removed from the property. Soil tests of the other property revealed contamination requiring cleanup pursuant to Department of Ecology (DOE) guidelines that had been enacted in 1987. According to Odermat, it was then that he learned of the environmental regulations requiring cleanup and decided to have the property's soil tested. When soil tests revealed gasoline contamination, Car Wash initiated operations to clean up the contaminated soil on or about August 6, 1990. During the clean-up process, three additional tanks were discovered. The clean-up costs totaled $53,933.86.

In 1991, Car Wash brought suit against Kampanos for contribution, alleging, *inter alia*, a cause of action for contribution pursuant to RCW 70.105D, the Model Toxics Control Act (MTCA),[2] and a cause of action for contribution under the MTCA when read in conjunction with RCW 4.22.

Following a bench trial, the trial court concluded that a contribution action existed under the MTCA when read in conjunction with RCW 4.22. The trial court also found by "overwhelming" evidence that the pollution occurred when the property was used as a gas station, which was prior to Car Wash's ownership. As a result, the trial court allocated seven-

---

[2]This cause of action was later dismissed on summary judgment.

elevenths of the clean-up costs to Kampanos, based on the number of years a gas station had been in operation during Kampanos' ownership. Pursuant to RCW 4.22.040, the remaining clean-up costs were allocated to Kampanos' predecessor.

The trial court entered judgment for Car Wash against Kampanos for $38,141.91, plus its taxable costs. The trial court denied an award of attorneys' fees to either party.

In denying Car Wash prejudgment interest, the trial court concluded:

> While the arithmetic sum of plaintiff's costs in clean up were known and computed, there has been so much controversy that the Court concludes that this is not a liquidated sum.

Kampanos appeals from the trial court's contribution award, and Car Wash cross-appeals the denial of prejudgment interest.

## RIGHT OF CONTRIBUTION UNDER RCW 70.105D.080

In seeking recovery of its clean-up costs from Kampanos, Car Wash had initially contended that the MTCA provided a private right of contribution. Before the matter was tried, however, the Washington Supreme Court held in *Bird-Johnson Corp. v. Dana Corp.*, 119 Wn.2d 423, 833 P.2d 375 (1992) that the MTCA by itself did not provide a private action for contribution. In so holding, the court focused on the fact that the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA or Superfund Act), 42 U.S.C. § 9601 *et seq.*, had been amended by the Superfund Amendments and Reauthorization Act of 1986 (SARA) to expressly provide for a private right of contribution. *Bird-Johnson*, 119 Wn.2d at 427. The court reasoned:

> The omission of these words is a clear indication that the MTCA's drafters did not intend to adopt CERCLA's more expansive contribution provision. We will not imply a private cause of action when the drafters of the statute evidenced a contrary intent; public policy is to be declared by the Legislature, not the courts. Obviously, the Legislature can amend the MTCA to include a right of contribution if it so desires.

(Citations omitted.) *Bird-Johnson*, at 427-28.

Following the *Bird-Johnson* decision, the trial court dismissed the MTCA contribution cause of action on summary judgment. Because Car Wash had also sought contribution based on the MTCA read in conjunction with RCW 4.22, a bench trial was held to determine whether the two statutes, construed together, created such a right.[3] The trial court concluded that the statutes could be construed together to create a right of contribution. Originally, Kampanos' principal assignment of error related to this conclusion by the trial court.

However, this issue has become moot. Since the briefs were submitted herein, the Legislature, in apparent response to the court's invitation in *Bird-Johnson*, amended the MTCA to expressly provide for a right of contribution. RCW 70.105D.080 provides in relevant part:

> [A] person may bring a private right of action, including a claim for contribution . . . against any other person liable under RCW 70.105D.040 for the recovery of remedial action costs. . . . Recovery shall be based on such equitable factors as the court determines are appropriate. Remedial action costs shall include reasonable attorneys' fees and expenses. Recovery of remedial action costs shall be limited to those remedial actions that, when evaluated as a whole, are the substantial equivalent of a department-conducted or department-supervised remedial action. Substantial equivalence shall be determined by the court with reference to the rules adopted by the department under this chapter. . . . The prevailing party in such an action shall recover its reasonable attorneys' fees and costs. . . .

RCW 70.105D.080 also provides for retroactive application of this section to all causes of action arising prior to May 12, 1993. The parties agree that this is dispositive of the issue of whether a right to contribution exists under the MTCA.

At oral argument, Kampanos argued that because the trial court did not consider whether the remedial action undertaken by Car Wash constitutes "the substantial equivalent of a department-conducted or department-supervised remedial action" as required by RCW 70.105D.080, we should remand for such a hearing.

---

[3]The *Bird-Johnson* court had expressly refused to address this issue. *Bird-Johnson*, at 428.

■ Car Wash responded that Kampanos had never challenged the adequacy of the cleanup in the action below and, therefore, it could not be raised on appeal. However, because RCW 70.105D.080 had not been enacted when the trial court rendered its decision, neither the parties nor the trial court *specifically* addressed whether the cleanup was "the substantial equivalent of a department-conducted or department-supervised remedial action". If Car Wash wishes to obtain the benefit of the amendment, it must conform to its requirements. As a result, if Kampanos chooses, Kampanos is entitled to have the trial court make a specific finding on this issue and, if necessary, take additional evidence.

CONTRACTUAL ALLOCATION OF ENVIRONMENTAL LIABILITIES

Nevertheless, Kampanos contends that Car Wash is barred from seeking contribution in this case because the "as is" clause in the purchase and sale agreement allocated the risk of MTCA liability to Car Wash.

Initially, we concluded that the clause was invalid per se because the MTCA did not explicitly authorize agreements in which private parties allocated the risk of MTCA liability between themselves. However, after considering Kampanos' motion for reconsideration and the submissions of amici curiae, we are persuaded that the MTCA does not prohibit such agreements.

■ It is well settled that parties may incorporate into a contract any provision that is not illegal or against public policy. *See, e.g., Coast Sash & Door Co. v. Strom Constr. Co.*, 65 Wn.2d 279, 281, 396 P.2d 803 (1964); *Cope v. J.K. Campbell & Assocs., Ltd.*, 71 Wn.2d 453, 456, 429 P.2d 124 (1967); *Redford v. Seattle*, 94 Wn.2d 198, 206-07, 615 P.2d 1285 (1980) (upholding indemnity contract because no statute barred the subject matter of the contract).

■■ In determining whether the MTCA bars agreements allocating MTCA liability between private parties, we apply the general rule that a reviewing court must ascertain and give effect to the legislative intent and purpose expressed in

the statute. *Grant v. Spellman*, 99 Wn.2d 815, 818, 664 P.2d 1227 (1983). In so doing, courts presume all legislation is constitutional and resolve all doubts in favor of validity unless it appears otherwise.[4] *Grant*, at 818-19. Accordingly, if a statute is open to alternative constructions, the court will construe it so as to uphold its constitutionality. *Grant*, at 819.

■ While the MTCA expressly provides that each person who is liable under the statute is strictly liable, jointly and severally, for all clean-up costs, it does not expressly prohibit private parties from allocating MTCA clean-up liability between themselves. In fact, the MTCA provides that it does not "affect[] or modif[y] in any way any person's right to seek or obtain relief under other statutes or under common law", RCW 70.105D.040(6), thereby recognizing implicitly that it does not impair the common law right to contract.

In the absence of express statutory language evidencing a legislative intent to prohibit agreements in which private parties allocate the risk of MTCA liability between themselves, we conclude that such agreements are not prohibited under the MTCA. In so concluding, we emphasize that such an agreement in no way alters a person's liability to the State under RCW 70.105D.040(2).

As Kampanos and amici point out, given the broad hazardous waste liability placed on parties to real estate transactions, these agreements are widely used as a means by which parties allocate the risks of environmental liability. *See* 4 Wash. State Bar Ass'n, *Real Property Deskbook* § 88.19, at 88-23, § 88.21, at 88-30 (1989). Thus, in the absence of a clear intent to prohibit such agreements, we should not disturb an established and effective business practice. *See Allen v. Griffin*, 132 Wash. 466, 469, 232 P. 363 (1925).

Moreover, because a party's liability to the State is not altered, agreements to allocate MTCA liability between pri-

---

[4]Both the federal and state constitutions prohibit the impairment of contractual obligations. U.S. Const. art. 1, § 10; Const. art. 1, § 23. However, legislation impairing contractual obligations may be upheld if shown to advance a legitimate public interest. *See Birkenwald Distrib. Co. v. Heublein, Inc.*, 55 Wn. App. 1, 9, 776 P.2d 721 (1989).

vate parties does not detract from the MTCA's main policy, which is to:

> raise sufficient funds to clean up all hazardous waste sites and to prevent the creation of future hazards due to improper disposal of toxic wastes into the state's land and waters.

RCW 70.105D.010(2). *See Mardan Corp. v. C.G.C. Music, Ltd.*, 804 F.2d 1454, 1459 (9th Cir. 1986). In fact, such agreements may further the MTCA's underlying purpose. In *AM Int'l, Inc. v. International Forging Equip. Corp.*, 982 F.2d 989 (6th Cir. 1993) (holding that CERCLA § 107(e)(1)[5] allows the contractual allocation of CERCLA liability between private parties, but such an agreement does not alter the parties' liability to the federal government), the court quoted with approval:

> . . . [P]rivate risk allocations substantially assist in facilitating real estate transactions. Risk shifting provides a mechanism for the parties to minimize exposure to the risk of third-party CERCLA claims. While also protecting against third-party claims, risk shielding primarily represents a means to protect against the risk of claims by the other party to the transaction. These techniques provide flexibility in the negotiating process and facilitate the parties' ability to close real estate transactions successfully. Because of these benefits, private risk allocations may further CERCLA's ultimate goal of cleaning up pollution caused by hazardous substances.

*AM Int'l*, at 995 (quoting Thaddeus Bereday, Note, *Contractual Transfers of Liability under CERCLA Section 107(E)(1): For Enforcement of Private Risk Allocations in Real Property Transactions*, 43 Case W. Res. L. Rev. 161, 212 (1992)).

Having determined that the MTCA does not prohibit the contractual allocation of MTCA liability between private parties, we now address Kampanos' contention that the trial court erred in failing to find that the parties intended the "as

---

[5]Section 107(e)(1) provides: "No indemnification, hold harmless, or similar agreement or conveyance shall be effective to transfer from the owner or operator of any vessel or facility or from any person who may be liable for a release or threat of release under this section, to any other person the liability imposed under this section. Nothing in this subsection shall bar any agreement to insure, hold harmless, or indemnify a party to such agreement for any liability under this section." 42 U.S.C. § 9607(e)(1).

is" clause in the purchase and sale agreement to transfer the risk of future environmental liability to Car Wash. Car Wash responds that there was no evidence that the "as is" clause was intended to transfer unknown environmental liability, especially where both the fact of pollution and legal liability did not exist when the parties executed the agreement.

■ In *Berg v. Hudesman*, 115 Wn.2d 657, 801 P.2d 222 (1990), the Washington Supreme Court established the "context rule" for contract interpretation:

> Determination of the intent of the contracting parties is to be accomplished by viewing the contract as a whole, the subject matter and objective of the contract, all the circumstances surrounding the making of the contract, subsequent acts and conduct of the parties to the contract, and the reasonableness of respective interpretations advocated by the parties.

115 Wn.2d at 667 (quoting *Stender v. Twin City Foods, Inc.*, 82 Wn.2d 250, 254, 510 P.2d 221 (1973)).

■ In the action below, both sides presented evidence in support of their respective positions as to their intent.[6] The trial court, however, entered no specific finding that the parties did intend the "as is" clause to transfer MTCA liability to Car Wash. The absence of a finding of fact in favor of the party with the burden of proof about a disputed issue is the equivalent of a finding against that party on that issue. *In re Marriage of Olivares*, 69 Wn. App. 324, 334, 848 P.2d 1281, *review denied*, 122 Wn.2d 1009 (1993).

---

[6]On the one hand, Kampanos focused on the following: (1) Odermat was an experienced buyer; (2) Odermat knew that the property had been used previously as a service station, but undertook no further investigation; (3) Odermat closed the sale despite his knowledge of the presence of underground tanks; (4) Car Wash made no claim against Kampanos when it found the tank with a hole emitting the odor of gasoline; and (5) Car Wash made no claim against Kampanos when it later discovered three additional tanks. Car Wash, on the other hand, stressed that: (1) the "as is" clause does not mention environmental pollution; (2) at that time of contracting, Odermat understood the clause to relate to the condition of the buildings on the property; (3) the agreement was reached before the underground tanks were discovered; (4) Car Wash did not know the soil was polluted until 1990; (5) the MTCA had not been enacted when the contract was executed; and (6) Kampanos' attorney drafted the purchase and sale agreement.

Furthermore, the trial court's findings support the conclusion that the parties did not intend to allocate the risk of MTCA liability via the "as is" clause. For instance, in findings of fact 16 and 22, the trial court found that Car Wash did not know of the contamination until it received the soil test results in 1990.[7] In addition, in finding of fact 12, the trial court found that the purchase and sale agreement was drafted by Kampanos' attorney. Thus, the trial court did not err in failing to conclude that parties intended the "as is" clause to allocate MTCA liability to Car Wash.

Kampanos next contends that Car Wash bore the risk of mistake under Restatement (Second) of Contracts § 154 (1981), which provides, in relevant part, that a party bears the risk of mistake when: (1) it is allocated to that party by agreement or (2) "he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient". *See also Bennett v. Shinoda Floral, Inc.*, 108 Wn.2d 386, 396, 739 P.2d 648 (1987).

Because the contract itself did not allocate the risk of MTCA liability to Car Wash, the issue is whether the trial court erred in failing to conclude that, at the time of contracting, Car Wash was aware that it had limited knowledge of facts relating to the soil contamination, but treated its knowledge as sufficient.

Again, because Kampanos had the burden of proof that Car Wash had limited knowledge and because the trial court entered no specific finding on this issue, we consider it a finding against Kampanos. *In re Marriage of Olivares*, 69 Wn. App. at 334. Moreover, the trial court's findings support the conclusion that Odermat did not have limited knowledge of facts relating to the soil contamination. In finding of fact 22, the trial court found that despite Odermat's business sophistication and the fact that he had reason to believe that

---

[7]We reject Kampanos' argument that these findings of fact are more properly designated conclusions of law. We note that Kampanos does not claim that these findings are not supported by substantial evidence.

a service station had been operated on the property, Odermat did not know of the contamination until Car Wash received the soil results in 1990. Thus, we conclude that the trial court did not err in refusing to find that Car Wash bore the risk of mistake under Restatement of Contracts § 154.

## APPLICATION OF EQUITABLE FACTORS

Kampanos next contends that the trial court misapplied the equitable factors to be used in determining the amount of recovery to Car Wash under RCW 70.105D.080. As a result, Kampanos argues that we should remand to the trial court with instructions on the proper application of the equitable factors. Because the trial court's approach was correct, we decline to do so.

■ The trial court determined Kampanos to be responsible for seven-elevenths of the clean-up costs incurred by Car Wash. This calculation was based on the number of years a service station was in operation during Kampanos' ownership of the property. It is apparent that the trial court's approach takes into account both the cause of the contamination, *i.e.*, the underground gasoline tanks, and Kampanos' relationship to the cause of contamination. Because Kampanos owned the property for 7 of the 11 years the underground storage tanks were actually in use, and thereby benefitted from the presence of the tanks, we conclude that the trial court did not err in applying the equitable factors it deemed appropriate.

## PREJUDGMENT INTEREST

Car Wash cross-appeals on the issue of whether the trial court erred in denying it prejudgment interest on the costs it incurred in cleanup.

■ Prejudgment interest can be awarded when an amount claimed is "liquidated". *Hansen v. Rothaus*, 107 Wn.2d 468, 472, 730 P.2d 662 (1986). A "liquidated" claim is one "where the evidence furnishes data which, if believed, makes it possible to compute the amount with exactness, without reliance on opinion or discretion." *King Cy. v. Puget Sound Power & Light Co.*, 70 Wn. App. 58, 61, 852 P.2d 313 (citing *Prier v.*

*Refrigeration Eng'g Co.*, 74 Wn.2d 25, 32, 442 P.2d 621 (1968)), *review denied*, 122 Wn.2d 1017 (1993). However, if the factfinder must exercise discretion to determine the measure of damages, the claim is unliquidated. *Aker Verdal A/S v. Neil F. Lampson, Inc.*, 65 Wn. App. 177, 191, 828 P.2d 610 (1992).

Car Wash argues that no opinion or discretion was required to determine the reasonableness or necessity of the clean-up expenses and, thus, its claim is liquidated.

We disagree. Although the amount that Car Wash expended to clean up the contamination was a sum certain, the amount that Kampanos owed for the clean up was not. The trial court's determination that Kampanos owed $38,141.91 in contribution, based on the number of years a service station was in operation during Kampanos' ownership of the property, was necessarily a product of the trial court's discretion pursuant to RCW 70.105D.080 which provides, "[r]ecovery shall be based on such equitable factors as the court determines are appropriate." *See Aker Verdal A/S*, 65 Wn. App. at 191. Thus, we conclude that the claim was unliquidated and the trial court properly denied Car Wash's request for prejudgment interest.

## ATTORNEYS FEES

At oral argument, Car Wash argued that we should remand for a determination of the amount of attorneys' fees owed Car Wash under RCW 70.105D.080, which provides that the prevailing party in a contribution action shall recover its reasonable attorneys' fees and costs.

Because the statute now expressly authorizes attorneys' fees for the prevailing party, Car Wash is entitled to a remand for a determination of the reasonable attorneys' fees owed it, provided that Kampanos does not choose to have this matter remanded for a determination of whether the clean up was "the substantial equivalent of a department-conducted or department-supervised remedial action". If, however, Kampanos does choose to pursue a remand of this matter, the prevailing party can seek attorneys' fees directly from the trial court.

Affirmed in part, and remanded in part, consistent with our decision herein.

SCHOLFIELD and KENNEDY, JJ., concur.