[No. 36382-4-I.    Division One.    June 9, 1997.]

DASH POINT VILLAGE ASSOCIATES, ET AL.,
*Respondents,* v. EXXON CORPORATION, ET AL.,
*Appellants.*

*Linda Blohm Clapham* and *Lane Powell Spears Lubersky,* for appellant Exxon Corporation.

*Philip R. Meade* and *Merrick, Hofstedt & Lindsey, P.S.,* for appellant BP Exploration and Oil, Inc.

*Scott M. Missal* and *Short, Cressman & Burgess; Brian E. Lawler* and *Lawler & Burroughs, P.C.;* and *Eric Einhorn,* for respondents.

*Thomas A. Newlon* of *Port of Seattle Legal Department* on behalf of Washington Public Ports Association, amicus curiae.

GROSSE, J. — After gasoline from an Exxon station contaminated the groundwater below a neighboring shopping

center owned by Dash Point,[1] a jury found Exxon liable under the Model Toxics Control Act (MTCA) and awarded Dash Point its costs and expenditures for remediation of the shopping center property. On appeal, Exxon does not dispute its liability for the cleanup of the Dash Point property. Rather it claims that the trial court erred (1) by failing to make a determination of whether Dash Point's remedial actions were substantially equivalent to a state-supervised cleanup operation, (2) by apportioning all the damages to Exxon, (3) by its award of litigation expenses, and (4) by its reliance on Dash Point's segregation between the successful MTCA claims and the unsuccessful common law claims in awarding attorney fees. We affirm.

## FACTS

Under the MTCA, a past or present property owner is liable for the cleanup and damages to the environment caused by the release of toxic substances.[2] In 1989, a MTCA environmental complaint was filed with the Department of Ecology (DOE) reporting contaminated leakage from underground storage tanks at Exxon's gas station. Exxon admitted that the groundwater under its property contains concentrations of petroleum hydrocarbons exceeding MTCA cleanup standards. The contamination was caused by overspills and by the removal of gasoline storage tanks. Exxon eventually initiated a cleanup of its property.

The Dash Point Shopping Village is located next to the Exxon station. In 1990, during a pending sale of the shopping center, a study revealed contaminants in its ground-

---

[1] "Exxon" refers to both appellants, Exxon Corporation and BP Exploration & Oil, Inc. (BP Oil). "Dash Point" refers to both respondents, the Dash Point Village Associates and Audrey & Sydney Irmas Charitable Foundation. Exxon sold the property to BP Oil in 1992. Dash Point Village Associates owned the shopping center until it sold it in 1993 to the Irmas Foundation. Exxon and BP Oil have stipulated that Exxon will indemnify BP Oil. Two other defendants, former station operators, Rossi and Still, settled.

[2] RCW 70.105D.040(1)(b), .040(2); *Olds-Olympic, Inc. v. Commercial Union Ins. Co.*, 129 Wn.2d 464, 472, 918 P.2d 923 (1996).

water. Exxon refused to acknowledge responsibility for this contamination. In 1991 through April 1992, Lee Dorigan, an environmental scientist hired by Dash Point, tested the Dash Point property and recorded levels of gasoline higher than the allowed MTCA levels.

In 1994, Dash Point hired AGI Technologies (AGI) to investigate the necessary steps to remediate the contamination at the shopping center. The AGI site assessment detected gasoline contamination in the groundwater beneath the Exxon site and discovered that contaminants in the groundwater had migrated onto the Dash Point property. According to AGI's remediation services manager, Gary Laakso, Exxon's remediation efforts were not cleaning up the Exxon station property nor were these efforts stopping further contamination at the Dash Point property.

Laakso proposed two alternative plans to clean up the Dash Point property. One plan assumed that Exxon would stop any further contamination, leaving only the past damage to clean up. This plan would cost $235,000. The second plan assumed that Exxon would not cooperate with Dash Point and stop future contamination. This plan would cost $398,000. His hydrocarbon contamination assessment cost $31,944 and it did not include expert witness fees.

Exxon hired SEACOR in March 1993 to continue the cleanup of its property. SEACOR's expert agreed that levels of contaminants at the Exxon station exceeded MTCA levels. He recommended evaluating the adjacent Dash Point shopping center property, but due to the pending litigation this did not happen. He thought the Exxon remedial system was reducing the contamination.

Before Dash Point's trial against Exxon and two former station operators, the trial court dismissed Dash Point's claim for common-law strict liability and its claims of violations of the Oil and Hazardous Substance Spill Prevention Act (RCW 90.56) and of the Washington Hazardous Waste Management Act (RCW 70.105). For the

surviving common-law claims and the MTCA claim, Dash Point settled with the former gas station operators for $18,500. During trial, Exxon prevailed in a motion for directed verdict to dismiss Dash Point's trespass claim.

Before the jury, Dash Point claimed Exxon was negligent and sought damages in the amount of $1.3 million for lost sales. It also requested damages for nuisance abatement for the cost of Laakso's cleanup plans. Dash Point sought recovery under the MTCA for past remediation costs and a declaratory judgment that Exxon was liable for future remediation expenses.

Exxon argued that the MTCA liability question should not be submitted to the jury because it was an equitable question for the judge to determine. Disagreeing, the trial court simply instructed the jury to find liability under the MTCA if it found that "Exxon exercised any control over the facility and that hazardous substances were disposed of or released into the environment[.]" The special verdict form asked the jury to determine "[w]hat amount should be awarded to the plaintiffs for past remedial action costs under the Model Toxics Control Act."

The jury found that Exxon and BP Oil were "liable to the plaintiffs as 'owners or operators' under the Model Toxics Control Act." It awarded Dash Point Village Associates $6,253.24 and it awarded the Irmas Charitable Foundation $13,934.39 for "drill & lab" costs. The court retained jurisdiction to determine if costs incurred to clean up the property in the future were substantially equivalent to a DOE-supervised remedial action. Under the MTCA, the court awarded Dash Point approximately $195,000 in attorney fees and $80,000 in litigation expenses. The jury did not find Exxon negligent but found that Exxon created a nuisance affecting Dash Point's property, but did not award damages for this claim.

## ANALYSIS

The statute at issue is RCW 70.105D.080, which allows a

person to seek the recovery of remedial action costs from the party responsible for contaminating property:

**70.105D.080 Private right of action—Remedial action costs.** Except as provided in RCW 70.105D.040(4)(d), a person may bring a private right of action, including a claim for contribution or for declaratory relief, against any other person liable under RCW 70.105D.040 for the recovery of remedial action costs. In the action, natural resource damages paid to the state under this chapter may also be recovered. Recovery shall be based on such equitable factors as the court determines are appropriate. Remedial action costs shall include reasonable attorneys' fees and expenses. Recovery of remedial action costs shall be limited to those remedial actions that, when evaluated as a whole, are the substantial equivalent of a department-conducted or department-supervised remedial action. Substantial equivalence shall be determined by the court with reference to the rules adopted by the department under this chapter. An action under this section may be brought after remedial action costs are incurred but must be brought within three years from the date remedial action confirms cleanup standards are met or within one year of May 12, 1993, whichever is later. The prevailing party in such an action shall recover its reasonable attorneys' fees and costs. This section applies to all causes of action regardless of when the cause of action may have arisen. To the extent a cause of action has arisen prior to May 12, 1993, this section applies retroactively, but in all other respects it applies prospectively.

*Remediation Costs*

■ ■ Because Exxon is liable for cleaning up the contamination at the Dash Point property, Dash Point may recover its remediation expenditures. The MTCA, however, limits reimbursement for remedial actions to ones that are the substantial equivalent to those the DOE would incur to remediate a property. Here the trial court asked the jury to determine if Exxon was liable under the MTCA, and, if so, for what amount of remediation expenses. However, the trial court did not decide whether Dash Point's remedial actions were the substantial equivalent

to a DOE-supervised operation. We agree with Exxon that this was error.

The plain language of the statute dictates that the trial court decide this question by providing that, "[s]ubstantial equivalence *shall be determined by the court* with reference to the rules adopted by the department under this chapter."[3] Substantial equivalence is a legal conclusion, which is a matter for the court to resolve.[4] Thus, the trial judge is the actor who "evaluate[s] as a whole" the remedial actions. This is the only reasonable interpretation of the statute in view of the fact that a MTCA contribution action involves equitable questions.[5] "Recovery [of remedial action costs] shall be based on such equitable factors as the court determines are appropriate."[6] Equitable questions are properly decided by the trial court.[7] Under analogous federal law, which we use to aid our interpretation of the MTCA,[8] it is the court that must make its own factual findings and legal conclusions to determine the equitable question of recovery of cleanup costs.[9] To the extent MTCA issues involve mixed questions of law and fact, the trial court still must make the ultimate conclusions of law.[10]

In short, although the trial court may use an advisory

---

[3]RCW 70.105D.080 (emphasis added).

[4]*Cf., Wilson v. State*, 84 Wn. App. 332, 341, 929 P.2d 448 (1996).

[5]*See generally Louisiana-Pac. Corp. v. Asarco Inc.*, 131 Wn.2d 587, 934 P.2d 685 (1997).

[6]RCW 70.105D.080.

[7]*See State ex rel. Dep't of Ecology v. Anderson*, 94 Wn.2d 727, 730-32, 620 P.2d 76 (1980); *State v. State Credit Ass'n, Inc.*, 33 Wn. App. 617, 620-21, 657 P.2d 327 (1983), *remanded*, 102 Wn.2d 1022 (1984).

[8]*Bird-Johnson Corp. v. Dana Corp.*, 119 Wn.2d 423, 427, 833 P.2d 375 (1992).

[9]*E.g., Gopher Oil Co. v. Union Oil Co. of Cal.*, 955 F.2d 519, 526 (8th Cir. 1992).

[10]*Cf., Tapper v. Employment Sec. Dep't*, 122 Wn.2d 397, 403, 858 P.2d 494 (1993).

jury to assist in resolving factual questions,[11] this does not obviate the duty of the court, exercising its equitable discretion, to make ultimate conclusions of law about the amount of recovery under the MTCA. And, crucially, to determine recovery, the substantial equivalence issue must be resolved by the court. Here not only did not the trial court not use the jury's determination for advisory purposes, it failed to address the substantial equivalency question at all.

■ Nevertheless, we need not reverse because on this record it is not debatable whether Dash Point's actions were the substantial equivalent to a department-supervised operation. The substantial equivalent question is evaluated with reference to the practices used at the time of the remediation actions. This approach is consistent with federal law.[12] It is also consistent with the retroactive nature of RCW 70.105D.080.

A DOE environmental supervisor, Joseph Hickey, testified that in 1989 DOE had draft guidelines on acceptable levels of gasoline constituents and on how to conduct site assessments and cleanup operations. These draft guidelines were eventually proposed and adopted as regulations in substantially the same form. Dorigan, who assessed the property before the DOE formally adopted regulations governing underground storage tanks, testified that she followed the draft guidelines used by DOE before formal adoption. Thus, she followed the standards that were the equivalent of a DOE-supervised project.

The other consultant, Laakso, testified that he also followed DOE standards. Asserting that Dash Point investigated the site to enable Laakso to testify at trial as an expert, Exxon claims that the costs incurred by Dash Point were not remediation costs. Exxon ignores that one component to remedial actions is site assessment and

---

[11]CR 39(c).

[12]See *NL Indus., Inc. v. Kaplan*, 792 F.2d 896, 898 (9th Cir. 1986).

investigation to determine the extent of a problem.[13] The regulations governing the cleanup of underground storage tanks provide standards for monitoring and testing.[14] The site evaluation was necessary since Exxon failed to respond appropriately to the spread of contamination from the Exxon station property to the Dash Point shopping center property. Thus, it was reasonable for Dash Point independently to assess and monitor the shopping center property.

Laakso testified he did not know the specifics of Exxon's cleanup operation, so Exxon argues he failed to follow WAC 173-340-360(5)(d)(v), which requires that a proposed remediation system "integrat[e] with existing facility operations and other current or potential remedial actions[.]" Exxon forgets that the reason Laakso could not do this fully is because Exxon failed to provide Dash Point with the necessary information about Exxon's cleanup efforts. In any event, Laakso's development of future plans without complete information does not invalidate the money spent to assess and monitor the Dash Point property.[15]

Exxon suggests that *Car Wash Enters., Inc. v. Kampanos*[16] requires us to reverse because there the court remanded with instructions "to have the trial court make a specific finding on [the substantial equivalence issue] and, if necessary, take additional evidence." *Car Wash* is not useful because the substantial equivalency requirement of RCW 70.105D.080 was not law at the time of the *Car Wash* trial and the appellate court remanded the issue for the court to consider the issue and take new evi-

---

[13]RCW 70.105D.020(20); WAC 173-340-450.

[14]WAC 173-340-550(5); WAC 173-340-450.

[15]As for future remediation efforts, the trial court has retained jurisdiction to determine if future remediation efforts comply with the rules. Before Dash Point is able to recover for these efforts, it will have to demonstrate that its actions are the substantial equivalent to a DOE-supervised project.

[16]74 Wn. App. 537, 543, 874 P.2d 868 (1994).

dence under the then new statute.[17] In contrast, remand is not necessary here because ample evidence was before the trial court to support a finding of substantial equivalency.

In summary, the record demonstrates as a whole that the costs incurred by Dash Point are recoverable under RCW 70.105D.080 because Dash Point's actions were the substantial equivalent of a DOE-supervised operation.

## *Apportionment*

■ ■ Exxon claims that the trial court erred by apportioning all responsibility for past remediation costs to Exxon and not to the other liable parties, the gas station operators. In response, Dash Point argues that Exxon should have initiated its own contribution action to request apportionment among other liable parties. Dash Point is wrong. The equitable power granted in RCW 70.105D.080 is broad enough that a separate action is not necessary, assuming proper proof that another party is liable is before the court.[18]

Because the MTCA provides for joint and several liability, Exxon suggests we apply the contribution provisions of RCW 4.22 to the MTCA to set off the settlements of the gas station operators.[19] We decline to use RCW 4.22[20] because we apply a specific statute over a general stat-

---

[17]74 Wn. App. at 543.

[18]Exxon argues that UNOCAL, a neighboring gas station, was another potentially liable party. Dash Point responds that because UNOCAL was not a party to this action, Exxon cannot claim that fault should be allocated to it. Exxon has not provided the full record on appeal and, thus, it is impossible to ascertain UNOCAL's potential liability and to review this issue. We note that it does appear that UNOCAL was not responsible for the contamination. Based on Laakso's review of UNOCAL's remediation plan and testing, he rejected Exxon's assertion that the contamination came from the nearby UNOCAL station. Hickey testified that, according to DOE records, no further remedial action was required at the UNOCAL station.

[19]*See* RCW 4.22.060(2). *See also* RCW 4.22.040, .050., 060. *See generally Bird-Johnson*, 119 Wn.2d at 431 (Johnson, J. dissenting).

[20]Even if we were to apply the contribution provisions of RCW 4.22, RCW 4.22.040 provides that in a contribution action, "the court may determine that two or more persons are to be treated as a single person for purposes of contribution." In other words, the court acts in equity. With such broad discretion, it

ute.[21] The MTCA specifically grants discretion to the trial court to base recovery on such equitable factors as it considers appropriate.[22] Since RCW 70.105D specifically provides for contribution actions to recover expenses incurred to clean up a property after the release of hazardous substances, this precludes the need for RCW 4.22.

■■ In deciding the allocation issue under the MTCA, the trial court applies "equitable factors it deem[s] appropriate"[23] to calculate the award by taking into account the cause of the contamination, the defendant's relationship to the contamination, as well as other pertinent discretionary factors.[24] On this record, it was not inequitable to hold Exxon responsible for all of the MTCA costs. The court appropriately considered that the former station operators settled the common-law claims for lost sale damages, not just the MTCA claims. In view of the rela-

---

is likely that the same result would have been reached under RCW 4.22 as was reached here.

[21]See S. Martinelli & Co. v. Department of Revenue, 80 Wn. App. 930, 940, 912 P.2d 521, review denied, 130 Wn.2d 1004 (1996).

[22]RCW 70.105D.080. Cf. Car Wash, 74 Wn. App. at 542 (noting that contribution issue under RCW 4.22 was moot with passage of RCW 70.105D.080).

[23]Car Wash, 74 Wn. App. at 548.

[24]See Car Wash, 74 Wn. App. at 549. Federal courts apply a broad range of equitable factors to determine the amount of recovery under the analogous federal law, Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), which provides that "[i]n allocating response costs among the liable parties, a court should employ such equitable factors as it determines are appropriate." Kerr-McGee Chem. Corp. v. Lefton Iron & Metal Co., 14 F.3d 321, 326 (7th Cir. 1994); 42 U.S.C. 9613(f)(1). In evaluating CERCLA contribution actions, federal courts apply the "Gore" factors, which are:

(1) the ability of the parties to demonstrate that their contribution to a discharge, release or disposal of a hazardous waste can be distinguished; (2) the amount of the hazardous waste involved; (3) the degree of toxicity of the hazardous waste involved; (4) the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste; (5) the degree of care exercised by the parties with respect to the hazardous waste concerned . . .; and (6) the degree of cooperation by the parties with Federal, State, or local officials to prevent any harm to the public health or the environment.

14 F.3d at 326 n.4.

tive fault of the parties,[25] the reasons for settlement, and the small amount of the MTCA costs, the trial court properly exercised its equitable discretion not to offset the settlements from the gas station operators and not to reduce Dash Point's award by the percentage of the operators' fault.

### Litigation Expenses

■■ Exxon claims that the court misconstrued the statute's use of the term "expenses" in awarding $80,000 in litigation expenses. The MTCA provides that:

> *Remedial action costs shall include reasonable attorneys' fees and expenses.* Recovery of remedial action costs shall be limited to those remedial actions that, when evaluated as a whole, are the substantial equivalent of a department-conducted or department-supervised remedial action. . . . The prevailing party in such an action [under RCW 70.105D.080] shall recover its reasonable attorneys' fees and costs.[26]

Exxon asserts that Dash Point should recover only statutory costs and not litigation expenses, relying on the narrow interpretation normally given to statutory "costs."[27] But the term "expenses" encompasses more than costs. Significantly the Legislature did not use the word "costs" in the phrase "reasonable attorneys' fees and expenses," but rather it selected the word "expenses." We interpret this deliberate phrasing to mean that the Legislature intended a broad reading of "expenses." Exxon relies on cases from other jurisdictions that do not allow recovery of litigation expenses; these cases are not helpful because

---

[25]*See Kerr-McGee*, 14 F.3d at 326.

[26]RCW 70.105D.080 (emphasis added).

[27]*E.g. Hume v. American Disposal Co.*, 124 Wn.2d 656, 674-75, 880 P.2d 988 (1994), *cert. denied*, 513 U.S. 1112 (1995).

those jurisdictions' statutes do not expressly provide for expenses.[28]

Exxon also argues that Dash Point is not entitled to litigation expenses because the expenses are not costs that are the substantial equivalent to a DOE-conducted operation. Exxon notes that in one sentence, RCW 70.105D.080 provides for "attorneys' fees and expenses" as part of remedial action costs, but then in the next sentence, it limits recovery of remedial costs to actions that are substantially equivalent to a DOE operation. Exxon's theory is that under the second sentence the remedial actions costs are limited to those legal expenses that the DOE could incur. We disagree. This interpretation would be inconsistent with the clear words of the statute, which expressly allow for expenses, "[r]emedial action costs *shall* include reasonable attorneys' fees and expenses." (Emphasis added.) We broadly interpret the MTCA because the act provides that "[t]he provisions of this act are to be liberally construed to effectuate the policies and purposes of this act."[29] Removing contamination involves many layers of activity, such as investigating hazardous releases, starting remedial actions, as well as initiating litigation to start or enforce cleanups. Dash Point necessarily incurred litigation expenses to establish Exxon's liability under the MTCA.

Our interpretation of RCW 70.105D.080 is entirely consistent with the recent decision of our Supreme Court involving the same issue.[30] Accordingly, the trial court did not err in awarding the litigation expenses of witness fees, deposition expenses, copying expenses, transcript fees, and expert witness fees.

*Attorney Fees*

Exxon claims the trial court erred by not adequately

---

[28]*E.g., Key Tronic Corp. v. United States*, 511 U.S. 809, 818-21, 114 S. Ct. 1960, 128 L. Ed. 2d 797 (1994); *Cash Flow Investors, Inc. v. Union Oil Co.*, 318 Or. 88, 862 P.2d 501, 504-08 (1993).

[29]RCW 70.105D.910.

[30]*Louisiana-Pac. Corp. v. Asarco Inc.*, 131 Wn.2d 587, 934 P.2d 685 (1997).

segregating Dash Point's MTCA-related attorney fees from its non-MTCA claims and from claims against other parties. Below, the fee award was vigorously contested. In a written motion and at oral argument, Exxon asserted that the fees should be reduced by $52,000 because Dash Point had not adequately segregated its time for the unsuccessful claims. After reviewing the working papers, the trial court stated:

> I believe that they are entitled to an award of attorneys fees in the amount of $196,144. I am of the view that that amount is just and reasonable under the facts and circumstances of this case and that there was sufficient segregation on the part of plaintiff with regard to that amount.

After judgment was entered, Exxon sought reconsideration of the fees. It provided the court with a list of fees it asserted were not related to the MTCA claim. At the hearing, Exxon requested a "careful inquiry" into the fees. Dash Point countered that the fees were reasonable because the case was complicated by Exxon's failure to admit that it had contaminated Dash Point's property and that the case was further complicated by the fact that Exxon disputed Dash Point's data and evidence in every detail.[31]

The court denied the motion to reconsider and signed findings of fact and conclusions of law, stating, "They accurately reflect my findings and thinking on this matter. I have signed it." In the findings, the court found the fees to be "sufficiently segregated from claims on which the plaintiffs did not prevail or are so interwoven to common factual issues that segregation cannot reasonably be made." The court found the billing rates were reasonable "in light of the complex environmental issues presented[.]" The court also found that the hours allocated to the MTCA claim were reasonable and not excessive or duplicative, "and were necessarily incurred to prosecute the

---

[31]As an example, Exxon rejected each of the 55 documents Dash Point sought to admit under ER 904(c) and CR 37(c).

plaintiffs' successful claims, because *inter alia*, of Exxon's refusal to make admissions upon request pursuant to CR 37 and ER 904." The court concluded that the fees were reasonable in view of the results obtained, the "award of past remedial action costs" and the declaratory judgment for future remedial action costs. The court also found that "[t]he Plaintiffs have segregated $157,651 in attorney fees billed for matters unrelated to the successful [MTCA] claim" and that "Plaintiffs would reasonably have incurred $195,793 in fees if only the [MTCA] claims had been raised."

It is well established that where attorney fees are authorized for only some of the claims, the award of fees "must properly reflect a segregation of the time spent on issues for which attorney fees are authorized from time spent on other issues."[32] Asserting that there were $51,918 worth of improper fees, Exxon urges this court to go beyond the written findings of fact, arguing that the trial court did not make a sufficient independent inquiry of the fees as required by *Travis v. Washington Horse Breeders Ass'n, Inc.*[33] Although we are suspicious of the trial court's apparent reliance on Dash Point's 45 percent discount of its total fees to make its determination that Dash Point appropriately segregated time spent on separate legal theories,[34] the record before us does not provide enough information to decide whether the trial court abused its discretion. During the six-week trial, Dash Point presented approximately 25 witnesses. In the record on appeal, there is testimony from approximately 10 of these witnesses. Even though Exxon cites to a list of the witnesses that it considers irrelevant to the MTCA claims, the record on appeal does not contain the substance of most of these wit-

---

[32]*Hume*, 124 Wn.2d at 672.

[33]111 Wn.2d 396, 410-11, 759 P.2d 418 (1988).

[34]*See Nordstrom, Inc. v. Tampourlos*, 107 Wn.2d 735, 744, 733 P.2d 208 (1987).

nesses' trial or deposition testimony.[35] A party seeking review has the burden of perfecting the record so that this court has before it all of the evidence relevant to the issue.[36] Even though the entire record is not required, "those portions of the verbatim report of proceedings necessary to present the issues raised on review" must be provided to the court.[37] Here, Exxon has not met its burden of perfecting the record.

Exxon also claims the fees were not reasonable relative to the size of the recovery because Dash Point received only $20,000 in MTCA costs and lost several of its claims, while receiving $195,000 in attorney fees and $80,000 in litigation expenses. The amount of the result compared to the fees is a relevant factor in determining attorney fees under some circumstances.[38] Here Dash Point achieved a significant result. Besides the amount it recovered for past remedial action costs, Dash Point obtained a judgment that Exxon is liable for future remedial action costs on the Dash Point property. According to trial testimony, these costs could range from $235,000 to $398,000. The jury also found that Exxon created a nuisance.

Exxon concedes that Exxon is liable for future response costs but claims that this only ensures that Exxon would finish the remediation, characterizing this as "an event

[35]Exxon also asserts it is not responsible for time spent addressing issues relating to UNOCAL. Based on the record before us, the UNOCAL time was relevant to the MTCA claim because Exxon asserted that UNOCAL was responsible for the contamination. Exxon also argues that it should not be responsible for time that Dash Point spent in settlement conferences with the gas station operators. But it is unclear from the record on appeal whether Exxon participated in the settlement talks with the operators. Moreover, time spent addressing the issues relating to the operators might be relevant to the extent they are viewed as agents of Exxon.

[36]*Olmsted v. Mulder*, 72 Wn. App. 169, 183, 863 P.2d 1355 (1993), *review denied*, 123 Wn.2d 1025 (1994).

[37]RAP 9.2(b).

[38]*Compare Scott Fetzer Co. v. Weeks*, 122 Wn.2d 141, 150, 859 P.2d 1210 (1993), *with Martinez v. City of Tacoma*, 81 Wn. App. 228, 241-44, 914 P.2d 86, *review denied*, 130 Wn.2d 1010 (1996).

which had never been questioned." Exxon's assertion distorts the record. Dash Point was forced to present a highly technical case to prove that Exxon was a liable party under the MTCA and to prove that Exxon's remediation efforts at the station were not mitigating the problems at the Dash Point shopping center. Dash Point's favorable judgment will ensure that Exxon is responsible for cleaning the groundwater beneath the Dash Point property. The trial court did not err in its award of attorney fees.

We affirm and grant Dash Point's request for attorney fees on appeal.[39]

KENNEDY, A.C.J., and ELLINGTON, J., concur.

After modification, further reconsideration denied August 28, 1998.

---

[39]RCW 70.105D.080 authorizes prevailing party attorney fees; accordingly, we hold that this applies to successful appellate actions as well. RAP 18.1.