**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clientlawareports/.

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| THOMAS CENTER OWNERS ASSOCIATION, | DIVISION ONE |
| Respondent, | No. 81987-9-I |
| v. | PUBLISHED OPINION |
| THE ROBERT E. THOMAS TRUST and MICHAEL HYTOPOULOS, Trustee, | |
| Appellant. | |
| HADLEY IMPROVEMENTS OWNER LLC, | |
| Intervenor Plaintiff, | |
| v. | |
| THE JOHN'S REAL ESTATE CORPORATION, a Washington corporation, | |
| Respondent, | |
| THE ROBERT E. THOMAS TRUST and MICHAEL HYTOPOULOS, Trustee, THOMAS CENTER OWNERS ASSOCIATION, a Washington nonprofit corporation, ESTATES OF ROBERT L. POLLOCK, and THOMAS A. WOLTHAUSEN, Personal Representative, | |
| Intervenor Defendants. | |

No. 81987-9-I/2

| ESTATES OF ROBERT L. POLLOCK, and THOMAS A. WOLTHAUSEN, Personal Representative, | |
|---|---|
| Third Party Plaintiff, | |
| v. | |
| HADLEY LAND OWNER, LLC, a Delaware limited liability company, WHIRLPOOL CORPORATION, a Delaware corporation, SYHADLEY LLC, a Delaware limited liability company, and KEELER 2013, LLC, a Washington limited liability company, | |
| Third Party Defendants. | |
| WHIRLPOOL CORPORATION, a Delaware corporation, | |
| Fourth Party Plaintiff, | |
| v. | |
| BORG WARNER MORSE TECH LLC, | |
| Fourth Party Defendant. | |

DWYER, J. — The Robert E. Thomas Trust (the Trust) appeals from the judgment entered in an action initiated by the Thomas Center Owners Association (the Association) pursuant to the Model Toxics Control Act (MTCA).[1] The Trust contends that the trial court erred by concluding that an indemnity clause contained within a 99-year ground lease did not cover liability arising under MTCA. Additionally, the Trust asserts that the trial court erred by (1) concluding that the Association qualified for the third party exemption to liability

---

[1] Former chapter 70.105D RCW, recodified as chapter 70A.305 RCW.

2

No. 81987-9-I/3

under MTCA, (2) awarding the Association remedial action costs that were proved through documentary evidence submitted after the trial court entered an order regarding each party's equitable share of liability, (3) denying the Trust's request that John's Real Estate Corporation (John's Real Estate) pay its equitable share of liability for certain remedial action costs that were incurred by the Trust, and (4) not awarding attorney fees and costs to the Trust and against John's Real Estate pursuant to MTCA.[2]

We hold that the trial court erred by concluding that the indemnity clause did not cover MTCA liability. Accordingly, we vacate both the trial court's allocation of each party's equitable share of MTCA liability and the trial court's award of remedial action costs and attorney fees and costs to the Association. On remand, the trial court must determine whether and how the parties' equitable shares of liability are impacted by the obligations of the Association and John's Real Estate pursuant to the indemnity clause.

We further hold that the trial court erred by denying the Trust's request that John's Real Estate be ordered to pay its equitable share of certain remedial action costs that were incurred by the Trust. Because the Trust is entitled to an award of remedial action costs, the Trust, on remand, is also entitled to an award of reasonable attorney fees and costs to be assessed against John's Real Estate under MTCA.

Giving perhaps some solace to the trial court, we affirm its ruling that the

---

[2] The Trust also contends that the trial court abused its discretion in calculating each party's equitable share of liability under MTCA and entering an unreasonable award of attorney fees and costs to the Association. Because of the manner in which we resolve the issues herein, we need not address these other issues raised by the Trust on appeal.

3

No. 81987-9-I/4

Association qualified for the third party exemption to liability under MTCA.  We also affirm the trial court's order authorizing the parties to prove the amount of remedial action costs that each party claimed to be entitled to through documentary evidence after the trial court entered its order on liability.

I

In the 1950s, Robert Thomas acquired the property on Mercer Island that is the subject of this dispute (the Thomas Property).  In 1961, Thomas constructed two commercial buildings on the property and, that same year, leased a commercial unit in one of those buildings to Robert and Inez Pollock.  From 1961 to 1974, the Pollocks operated a dry cleaning business on the property.  The Pollocks subsequently transferred operation of the dry cleaning business to the Kerk Company, which operated the business until sometime between 1976 and 1978.

In 1963, Thomas entered into a ground lease with Charles and Vincenta Sparling and George and Jean Donnally.  The ground lease provided that "[t]he term of this lease shall be ninety-nine (99) years, commencing on the 1st day of September, 1963."  The ground lease also contained the following indemnity clause:

> (8) Indemnity:  The Lessees shall keep the premises and all the appurtenances thereto and improvements thereon including the sidewalks, and street area surrounding the same in a safe and secure condition and free from all obstructions and clean and sanitary to the satisfaction of the officials of any governmental agency and the Lessees will save and hold the Lessor harmless from any and all damages, costs, fees and expenses or suits by public officials or private parties on account of any defective conditions of said premises, sidewalks and street areas or on account of any business, use or occupation of the said premises or

4

> any part thereof.  However, the obligations of the Lessees under this paragraph shall not inure to the benefit of any one other than the Lessor and his successors in title and in no way shall create a duty upon the part of the Lessees as to strangers which the Lessees would not have in absence of this paragraph.

From August 1963 through July 1975, Thomas was the landlord under the ground lease.  In 1976, Thomas died and the Robert E. Thomas Trust was created by his will.  Through Thomas's will, the fee title interest in the property and the landlord interest in the ground lease was transferred to the Trust.

In July 1975, the Sparlings and Donnallys assigned their tenant interest in the ground lease to John's Real Estate.  John's Real Estate remained as the tenant under the ground lease until June 1985.

In January 1976, John's Real Estate recorded a declaration of covenants, conditions, restrictions, and reservations to create a commercial condominium complex, the Thomas Center Condominiums.  The recording of this declaration also created the Thomas Center Owners Association.  Pursuant to the declaration, John's Real Estate reserved control over the common areas of the buildings located on the property for six months.  In July 1976, the Association assumed the authority to manage the common areas of these buildings.

John's Real Estate reserved assigning its interest in the ground lease to the Association so that it could construct a third building on the property.  In June 1985, John's Real Estate assigned its interest in the ground lease to the Association.

In January 2014, the owner of a neighboring property (the Hadley Property) notified the Trust that the Thomas Property was contaminated with

Tetrachloroethylene (PCE) and that the contamination was spreading to the Hadley Property.  In April 2014, the Trust received a letter from the Department of Ecology in which the Department notified the Trust that the Thomas Property was added to a list of known or suspected contaminated properties.

The Trust subsequently hired Pacific Groundwater Group (PGG) to investigate the potential contamination of the Thomas Property.  PGG issued a report confirming that the Thomas Property was contaminated with PCE and that its likely release occurred from the dry cleaning business.[3]

In the meantime, the Association hired a commercial real estate expert, Gus Levin, to investigate potential contamination on the Thomas Property.  In April 2014, Levin informed the Association that the Thomas property was potentially contaminated with a hazardous substance.  All parties believe that the contamination on the Thomas Property was caused by the dry cleaning business, which operated from 1961 until sometime between 1976 and 1978.

In January 2015, the Association sued the Trust, seeking, in part, a declaratory judgment that it had no liability related to the contamination on the Thomas Property under MTCA.  In June 2015, both the Association and the Trust filed motions for summary judgment.  In the Trust's motion, the Trust sought summary judgment determinations that the Association was a potentially liable person under MTCA and that the ground lease's indemnity clause required the Association to indemnify the Trust for liability arising under MTCA.  In the

---

[3] An invoice from PGG that was admitted into evidence at trial indicates that the Trust incurred approximately $100,000 in costs for the investigation conducted by PGG.

6

No. 81987-9-I/7

Association's motion, the Association sought a summary judgment determination that it was not a potentially liable person under MTCA.

The trial court granted the Trust's motion in part and denied the Association's motion. The trial court granted the Trust's motion insofar as it sought a determination that the Association was a potentially liable person under MTCA. However, the trial court denied the Trust's motion with respect to the indemnity clause, reasoning that the "issue of the intent and expectations of the parties . . . precludes a determination that, as a matter of law, [the indemnity clause] would apply in the present context."

The Trust subsequently moved to join John's Real Estate as a third party defendant. The trial court granted the motion.[4] On November 12, 2019, the case proceeded to a bench trial.

Following the trial proceeding on liability, the trial court entered findings of fact and conclusions of law. The trial court found that the indemnity clause "was not intended to and did not contemplate indemnification for subsurface environmental conditions." Finding of Fact 56. Additionally, the trial court concluded that the Association was not liable under MTCA because it qualified for the third party exemption to liability under former RCW 70.105D.040 (2013),

---

[4] In September 2015, Hadley Improvements Owner LLC intervened in the action by stipulation. Hadley filed a complaint seeking recovery under MTCA from the Association, the Trust, John's Real Estate, and the estates of Robert and Inez Pollock. The Association, the Trust, John's Real Estate, and the Pollock estates entered into a joint defense agreement and retained Environmental Partners, Inc. (EPI) to investigate both the contamination at the Thomas Property and claims that were raised by Hadley. EPI estimated that the cost of remediating the Thomas Property could range between $2 million and $4 million. The parties ultimately entered into a settlement agreement with Hadley and the Pollock estates. Accordingly, only the Association, the Trust, and John's Real Estate litigated at trial.

7

No. 81987-9-I/8

recodified as RCW 70A.305.040. In addition, the trial court determined that, under MTCA, the Trust's equitable share of liability amounted to 85.35 percent and John's Real Estate's equitable share of liability amounted to 14.65 percent. Finally, the trial court's findings of fact and conclusions of law provided that "[t]he parties are awarded their statutory fees and costs based on the foregoing allocation, and are directed to submit the same to this court within 14 days of this Order."

Subsequently, the Association submitted a motion, attached with a declaration and exhibits, in which it sought an award of remedial action costs and attorney fees and costs. The Trust and John's Real Estate filed responses to the Association's request. On March 20, 2020, the trial court entered an order denying the Association's motion without prejudice, requesting that the Association file a renewed motion clarifying the costs and fees to which it believed it was entitled.

The Association then submitted a renewed motion for remedial action costs and attorney fees and costs. Attached to this renewed motion was a declaration and various exhibits. The Trust and John's Real Estate again filed responses. On August 19, 2020, the trial court entered findings of fact and conclusions of law wherein the court awarded remedial action costs and attorney fees and costs to the Association. On October 16, 2020, the trial court entered judgment.

The Trust appeals.

8

No. 81987-9-I/9

II

The Trust first contends that the trial court erred by finding that the Association was not required to indemnify the Trust for liability arising under MTCA. Because the language in the indemnity clause unambiguously covered liability arising under MTCA, we agree.

A

"Indemnity agreements are subject to the fundamental rules of contract interpretation." Newport Yacht Basin Ass'n of Condo. Owners v. Supreme Nw., Inc., 168 Wn. App. 86, 100, 285 P.3d 70 (2012). "The interpretation of a contract can be a mixed question of law and fact." Rekhter v. Dep't of Soc. & Health Servs., 180 Wn.2d 102, 134, 323 P.3d 1036 (2014) (plurality opinion). "But where the contract presents no ambiguity and no extrinsic evidence is required to make sense of the contract terms, contract interpretation is a question of law." Rekhter, 180 Wn.2d at 134 (plurality opinion).

"A court's purpose in interpreting a written contract is to ascertain the parties' intent." Spectrum Glass Co. v. Pub. Util. Dist. No. 1 of Snohomish County, 129 Wn. App. 303, 310, 119 P.3d 854 (2005). "Washington follows the objective manifestation theory of contract interpretation, under which courts attempt to ascertain the intent of the parties 'by focusing on the objective manifestations of the agreement, rather than on the unexpressed subjective intent of the parties.'" Hulbert v. Port of Everett, 159 Wn. App. 389, 399, 245 P.3d 779 (2011) (quoting Hearst Commc'ns, Inc. v. Seattle Times Co., 154 Wn.2d 493, 503, 115 P.3d 262 (2005)). "Courts 'impute an intention

9

corresponding to the reasonable meaning of the words used,' and words are given their ordinary, usual, and popular meaning unless the agreement as a whole clearly demonstrates otherwise." Hulbert, 159 Wn. App. at 399 (quoting Hearst, 154 Wn.2d at 503).

"Under the context rule, extrinsic evidence relating to the context in which a contract is made may be examined to determine the meaning of specific words and terms." Hulbert, 159 Wn. App. at 399-400. Notably, however, "surrounding circumstances and other extrinsic evidence are to be used 'to determine the meaning of specific words and terms used' and not to 'show an intention independent of the instrument' or to 'vary, contradict or modify the written word.'" Hearst, 154 Wn.2d at 503 (italicization omitted) (quoting Hollis v. Garwall, Inc., 137 Wn.2d 683, 695-96, 974 P.2d 836 (1999)).

B

The ground lease contains two provisions of particular significance to our inquiry. First, the indemnity clause within the ground lease states:

> (8) Indemnity: The Lessees shall keep the premises and all the appurtenances thereto and improvements thereon including the sidewalks, and street area surrounding the same in a safe and secure condition and free from all obstructions and clean and sanitary to the satisfaction of the officials of any governmental agency and *the Lessees will save and hold the Lessor harmless from any and all damages, costs, fees and expenses or suits by public officials or private parties on account of any defective conditions of said premises, sidewalks and street areas or on account of any business, use or occupation of the said premises or any part thereof*. However, the obligations of the Lessees under this paragraph shall not inure to the benefit of any one other than the Lessor and his successors in title and in no way shall create a duty upon the part of the Lessees as to strangers which the Lessees would not have in absence of this paragraph.

10

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

(Emphasis added.)

Second, the ground lease specifies that "[t]he term of this lease shall be ninety-nine (99) years, commencing on the 1st day of September, 1963."

The trial court found that, read in its entirety, the indemnity clause was not intended to cover liability arising from subsurface environmental contamination:

> The language of paragraph 8 of the Ground Lease primarily references indemnification for general tort liability and non-compliance with governmental regulations related to sanitation or hazardous conditions that could lead to tort liability. Considering the entirety of Paragraph 8, as written, the Court finds that the indemnity language contained therein was not intended to and did not contemplate indemnification for subsurface environmental conditions.

Finding of Fact 56.

Furthermore, the trial court relied on an expert witness's testimony to find that "it was neither routine nor customary for a purchaser or ground lessee to undertake any investigation into possible subsurface environmental contamination" in 1963, when the ground lease was executed. Finding of Fact 53.

The trial court erred. Because the language of the document is clear, no testimony speculating on its meaning was authorized. Moreover, all necessary context is provided by the contract term setting forth the length of the lease.

The trial court incorrectly determined that the language used in the indemnity clause was not intended to cover liability arising from subsurface contamination. To the contrary, the indemnity clause explicitly provided that "the Lessees will save and hold the Lessor harmless from *any and all* damages, costs, fees and expenses or suits." (Emphasis added.) It is well established that

11

No. 81987-9-I/12

"the phrase 'any and all claims' is to be given its ordinary meaning and includes all types of claims." Newport Yacht Basin, 168 Wn. App. at 101 (quoting MacLean Townhomes, LLC v. Am. 1st Roofing & Builders, Inc., 133 Wn. App. 828, 831, 138 P.3d 155 (2006)); see also Jacob's Meadow Owners Ass'n v. Plateau 44 II, LLC, 139 Wn. App. 743, 769-70, 162 P.3d 1153 (2007) (holding that the phrase "any and all claims" in an indemnity clause referenced all claims and was not limited to tort-based claims).

For instance, in MacLean Townhomes, an indemnity clause provided:

SUBCONTRACTOR shall defend, indemnify, and hold CONTRACTOR harmless from any and all claims, demands, losses and liabilities to or by third parties arising from, resulting from, or connected with, services performed or to be performed under this Subcontract . . . to the fullest extent permitted by law and subject to the limitations provided below.

133 Wn. App. at 831 (bold face omitted).

We therein explained that the paragraphs that followed the portion of the clause quoted above "contain[ed] various specifications regarding the subcontractor's duties, none of which say that the initial characterization 'any and all' [was], in fact, restricted to only tort-based claims." MacLean Townhomes, 133 Wn. App. at 833.

The indemnity clause herein stated, in pertinent part, that

the Lessees will save and hold the Lessor harmless from *any and all* damages, costs, fees and expenses or suits by public officials or private parties . . . on account of *any business, use or occupation* of the said premises or any part thereof.

(Emphasis added.)

12

The portion of the clause that preceded this language described the lessees' general duties as lessees; it did not restrict the phrase "any and all damages, costs, fees and expenses or suits" in any way:

> The Lessees shall keep the premises and all the appurtenances thereto and improvements thereon including the sidewalks, and street area surrounding the same in a safe and secure condition and free from all obstructions and clean and sanitary to the satisfaction of the officials of any governmental agency.

Furthermore, the lease agreement itself specified that "[t]he term of this lease shall be ninety-nine (99) years." This language is significant. In the context of a 99-year lease, the phrase "any and all" encompasses the entire universe of all causes of action and means of loss, regardless of whether those causes of action or means of loss were foreseeable or foreseen when the lease was executed. Indeed, when entering into such an indemnity clause in the context of a 99-year lease agreement, reasonable parties would foresee that then-unforeseen or unforeseeable causes of action and means of loss could arise over the course of a century.

During oral argument, counsel for the Association asserted that, for the indemnity clause to cover liability arising under MTCA, the phrase "any and all" must be followed by the phrase "and that now exist or may in the future come to exist."[5] But that added language is redundant. The phrase "any and all," by its plain terms, encompasses those causes of action and means of loss that now

---

[5] Wash. Court of Appeals oral argument, Thomas Center Owners Ass'n v. The Robert E. Thomas Trust, No. 81987-9-I (Sept. 23, 2021), at 20 min., 20 sec. through 21 min., 57 sec. (on file with court).

exist or may in the future come to exist. This is no mystery. In plain English, "any and all" means any and all.

The following hypothetical is illustrative of the point we make. Had the same 99-year lease agreement been entered into in 1864 (99 years before the lease agreement herein was executed) then various unforeseen causes of action and means of loss could have arisen on this very property over the next century that would plainly fall within the scope of the indemnity clause. For example, it is conceivable that an electrical fire in a building could occur in 1960, leading to the death of two people: the first of whom dies from the fire inside the building and the second of whom dies as he attempts to escape the fire and, as he enters his parked automobile, is killed when flames and heat from the fire cause the car's gas tank to explode. Under these circumstances, the survivors of these decedents could be entitled to file wrongful death actions against the owner of the property. See RCW 4.20.010.

However, the hypothetical presents two means of loss that were unforeseeable when the lease agreement was executed in 1864. First, it was unforeseeable that a person could die in an electrical fire in a building because buildings were not equipped with electricity in 1864. Second, it was unforeseeable that a person could die as a result of an automobile exploding in 1864 because neither automobiles nor internal combustion engines then existed. Moreover, even the particular cause of action alleged was unforeseeable

No. 81987-9-I/15

because, in 1864, there was no cause of action for wrongful death.[6]

Extraordinarily, however, the position advanced herein by the Association and John's Real Estate would necessarily lead to the conclusion that the 1864 indemnity clause would not cover the losses arising from these two deaths because neither the means of loss (electrical fires and automobile explosions) nor the cause of action (wrongful death) were foreseeable at the time of the Civil War. This is a ridiculous conclusion. After all, it is undeniable that, when the original parties executed the lease agreement herein in 1963, they were sentient beings who would reasonably have been aware that the world would evolve over the course of the next century, as it had over the course of the prior century.

Furthermore, by 1963, Washington courts had long recognized that parties could be held liable in tort for losses arising from what may today be classified as environmental contamination. See, e.g., Cunningham v. Town of Tieton, 60 Wn.2d 434, 435, 438-39, 374 P.2d 375 (1962) (affirming a judgment wherein a town was held liable for "an unconstitutional damaging by nuisance" because it deposited sewage into a lagoon that contaminated private water wells located underneath the lagoon); Lennon v. City of Seattle, 69 Wash. 447, 453, 125 P. 770 (1912) (affirming a judgment wherein a city was found negligent for a sewage leak that caused damage to private property); Hayes v. City of Vancouver, 61 Wash. 536, 539, 112 P. 498 (1911) (stating that cities may be

---

[6] The cause of action for wrongful death first arose in the Washington territory in 1875. LAWS OF 1875, § 4. Later, in 1909, the Washington state legislature enacted a statute that provided a cause of action for wrongful death. LAWS OF 1909, ch. 129, § 1.

15

held liable for trespass when sewage from a public utility system floods the premises of private property).[7]

It is of no consequence that the particular cause of action—here, the cause of action arising under MTCA—was unforeseen when the lease agreement was entered into. The indemnity clause, by its plain terms, covered such liability and losses arising therefrom.

C

Nevertheless, the Association and John's Real Estate contend that the indemnity clause was required to explicitly state that it applied to environmental contamination for it to cover liability arising under MTCA. In support of this argument, they cite to Hulbert, 159 Wn. App. 389, and Car Wash Enterprises, Inc. v. Kampanos, 74 Wn. App. 537, 874 P.2d (1994). Neither authority supports their argument.

Notwithstanding assertions to the contrary, Hulbert does not require that an indemnity clause explicitly mention liability arising under MTCA for a party to be required to indemnify another for losses arising from such liability. In that case, a purchase and sale agreement provided that the sellers "agreed to indemnify the [purchaser] against liability involving hazardous substances for three years after the date of sale." Hulbert, 159 Wn. App. at 395. Fifteen years after the agreement was executed, the purchaser was required to perform

---

[7] Thus it is clear that, in 1963, had sewage leaked from the dry cleaning business to surrounding properties, tort liability would exist on the basis of trespass, nuisance, or negligence. Thus, when the lease was entered into, it was indeed foreseeable that environmental contamination could give rise to actionable losses. While such foreseeability is not necessary for parties to enter into a contract of this type, even on this basis the trial court's ruling comes up short.

16

remedial investigation and cleanup work on the property. Hulbert, 159 Wn. App. at 396. The sellers were subsequently "notified that they were potentially liable for costs incurred in the investigation and remediation of the land under the MTCA." Hulbert, 159 Wn. App. at 396.

We held that the indemnity clause therein did not contain any language indicating that the purchaser agreed to release the sellers from environmental liability arising *after* the three-year indemnity period expired. Hulbert, 159 Wn. App. at 396. Therefore, "the Agreement did not preclude a statutory MTCA contribution action after the three years expired." Hulbert, 159 Wn. App. at 400.

The indemnity clause in Hulbert is significantly distinguishable from the indemnity clause herein. Indeed, unlike the indemnity clause in Hulbert, the indemnity clause at issue herein provided that the lessees will indemnify the lessor for "*any and all* damages, costs, fees and expenses or suits by public officials or private parties . . . on account of any business, use or occupation of the said premises or any part thereof." (Emphasis added.) As already explained, such language unambiguously covers losses arising under MTCA. Moreover, this indemnity clause was contained within a lease agreement, which, by its own wording, had a term of "ninety-nine (99) years." The 99-year term of one contract starkly contrasts with the 3-year term of the other.

The sellers in Hulbert also argued that an "as is" clause demonstrated that the parties intended that the sellers would not be held liable for hazardous substances on the property after the three-year indemnity period expired. 159 Wn. App. at 400-01. The "as is" clause stated that the purchaser

17

> "inspected the physical condition of the Property and accepts such condition subject to the terms and conditions of the Agreement and the Certificate and Indemnity attached hereto . . . relating to hazardous materials investigation and cleanup, if required."

Hulbert, 159 Wn. App. at 401.

We noted that "conspicuously absent from the Agreement and the Certificate is an explicit expression of an intent to allocate MTCA liability." Hulbert, 159 Wn. App. at 401. However, we did not hold that, in order to allocate liability arising under MTCA, an indemnity clause must explicitly mention MTCA. Rather, we explained that, "where the evidence does not demonstrate that the parties so intended, an 'as is' clause does not contractually allocate MTCA liability." Hulbert, 159 Wn. App. at 401.

Because the language of the indemnity clause herein unambiguously covered unforeseen liability, Hulbert is inapplicable and the trial court was not authorized to examine extrinsic evidence in order to vary, contradict, or modify the lease's written words. See Hearst, 154 Wn.2d at 503.

The Car Wash Enterprises decision is also of no aid to the Association and John's Real Estate. In that case, a seller sold property on which a service station had once operated. Car Wash Enters., 74 Wn. App. at 539. The purchase agreement contained an "as is" clause:

> "5. CONDITION OF PROPERTY. Purchaser has examined the Property and all improvements thereon, and accept [sic] the same as is and in present condition."

Car Wash Enters., 74 Wn. App. at 539. In a later MTCA contribution action brought by the buyer, the seller argued that the "as is" clause allocated the risk of MTCA liability to the purchaser. Car Wash Enters., 74 Wn. App. at 543.

18

No. 81987-9-I/19

We began by noting that private agreements that allocate the risk of liability between themselves are not prohibited under MTCA. Car Wash Enters., 74 Wn. App. at 544. Based on the facts of that case, however, we held that "the trial court did not err in failing to conclude that [the] parties intended the 'as is' clause to allocate MTCA liability to [the purchaser]." Car Wash Enters., 74 Wn. App. at 547. Our holding was based on the trial court's factual findings:

> The trial court . . . entered no specific finding that the parties did intend the "as is" clause to transfer MTCA liability to [the purchaser]. The absence of a finding of fact in favor of the party with the burden of proof about a disputed issue is the equivalent of a finding against that party on that issue. In re Marriage of Olivares, 69 Wn. App. 324, 334, 848 P.2d 1281, review denied, 122 Wn.2d 1009, 863 P.2d 72 (1993).

Car Wash Enters., 74 Wn. App. at 546.

We did not hold that, in order to allocate liability arising under MTCA, an indemnity clause must explicitly mention MTCA. Instead, the Car Wash decision is best read as simply recognizing that "accepting" a property after inspections "as is" in a real estate sale is not the same as "accepting" the seller's tort liability arising from the seller's prior use of that property. Indeed, "as is" clauses in purchase and sale agreements are common. They routinely convey the property in its existing condition. They do not routinely convey tort liability arising from prior use of that property (either real or personal).[8]

One final note. The indemnity agreement not only includes "any and all" claims—it also covers these claims as they arise from "any . . . use" of the

---

[8] In fact, the premier law dictionary defines "as is" as follows: "In the existing condition without modification." BLACK'S LAW DICTIONARY 141 (11th ed. 2019). This definition supports our analysis.

19

subject property. As the dry cleaning business obviously amounted to a use of the property—and *any* use falls within the scope of the clause—the fact that the dry cleaner's use caused pollution and contamination does not exclude it from the ambit of the agreement.

The trial court erred by ruling that the indemnity clause did not cover losses arising under MTCA.

III

The Trust next asserts that the trial court erred by concluding that the Association qualified for the third party exemption to liability provided by former RCW 70.105D.040(3)(a)(iii). This is so, the Trust avers, because the trial court found that the Association "caused or contributed" to the release of a hazardous substance when it determined that the Association did not qualify as an innocent purchaser. Because the trial court did not find that the Association caused or contributed to the release of a hazardous substance, we disagree.

Former RCW 70.105D.040 provides that each owner and operator of a "facility"[9] is generally strictly liable, jointly and severally, for all remedial action costs and for all natural resource damages resulting from the release of hazardous substances. However, certain categories of persons are exempted from liability. One such exemption provides:

> (3) The following persons are not liable under this section:

---

[9] "'Facility' means (a) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, vessel, or aircraft, or (b) any site or area where a hazardous substance, other than a consumer product in a consumer use, has been deposited, stored, disposed of, or placed, or otherwise come to be located." Former RCW 70A.105D.020(8) (2013). Here, the trial court concluded that the "facility" was the building "from which the parties agree that the release at issue was occurring during the operation of the [dry cleaning business]." Conclusion of Law 12.

No. 81987-9-I/21

> (a) *Any person who can establish that the release or threatened release of a hazardous substance for which the person would be otherwise responsible was caused solely by*:
>
> . . .
>
> (iii) *An act or omission of a third party* (including but not limited to a trespasser) other than (A) an employee or agent of the person asserting the defense, or (B) any person whose act or omission occurs in connection with a contractual relationship existing, directly or indirectly, with the person asserting this defense to liability. This defense only applies where the person asserting the defense has exercised the utmost care with respect to the hazardous substance, the foreseeable acts or omissions of the third party, and the foreseeable consequences of those acts or omissions.

Former RCW 70.105D.040 (emphasis added).

The trial court concluded that the Association qualified for the third party liability exemption. The Trust assigns error to this ruling because, according to the Trust, the trial court inconsistently determined that the Association "caused or contributed" to the release of a hazardous substance by concluding that the Association did not qualify as an innocent purchaser under former RCW 70.105D.040(3)(b)(iii).[10] As such, the Trust claims, the trial court erred by concluding that the Association qualified for the third party exemption, which requires that the "release or threatened release of a hazardous substance for which the person would be otherwise responsible was caused solely by . . . [a]n act or omission of a third party." Former RCW 70.105D.040(3)(a)(iii).

However, in fact, the trial court did not find that the Association caused or contributed to the release of a hazardous substance. To the contrary, the trial court found that "[t]he Association had no fault related to the contamination as it

---

[10] The Trust does not contend that the Association failed to establish the other statutory requirements of the third party liability exemption.

21

did not cause or contribute to the cause thereof." Finding of Fact 59(iii).

Moreover, the trial court found that "[i]t is undisputed that the contamination on

the Thomas Property was caused by the dry-cleaning operations." Finding of

Fact 27.

In determining that the Association did not qualify as an innocent

purchaser, the trial court concluded that "under Grey v. Leach, 158 Wn. App.

837, 847, 244 P.3d 970, 974 (2010)[,] a party cannot be an innocent purchaser, if

the contamination occurred while they owned or operated the facility, even if they

did not know contamination of the land was occurring." Conclusion of Law 11.

According to the trial court,

> the Association assumed from [John's Real Estate] on July 22,
> 1976, power and authority to manage the Common Areas, which
> included responsibility for maintaining Building A, the facility from
> which the parties agree that the release at issue was occurring
> during the operation of the [dry cleaning business]. Accordingly,
> the Court concludes that the Association's control of the "facility" for
> the short period between July 22, 1976 and January 1, 1978, when
> [the] contamination was still occurring under Kerk Company
> operation precludes the Association from being found "not liable" as
> an innocent purchaser under RCW 70.105D.040(3)(b).

Conclusion of Law 12.

Notably, the trial court found that "[n]o evidence was presented that the

contamination on the Thomas Property was caused or permitted due to a failure

on the part of any party to maintain the Common Areas." Finding of Fact 62.

Therefore, the trial court did not conclude that the Association failed to

qualify as an innocent purchaser because it "caused or contributed" to the

release of a hazardous substance. Rather, the trial court concluded that the

Association did not qualify as an innocent purchaser because it exercised control

22

No. 81987-9-I/23

over the common areas of the facility when the release of a hazardous substance occurred.[11]

Accordingly, the Trust's assignment of error fails.

IV

The Trust also contends that the trial court erred by awarding remedial action costs that were proved through documentary evidence submitted after the

---

[11] This ruling was correct. To qualify as an innocent purchaser, an owner of a facility must have acquired the facility *after* the hazardous substance had already been released or disposed of at the facility. Indeed, federal appellate courts have interpreted the analogous "innocent landowner" defense under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, (CERCLA), 42 U.S.C. ch. 103, to require a property owner to prove that the "disposal" of the hazardous substance at issue both occurred before the owner acquired the property and did not continue to occur thereafter. See, e.g., Carson Harbor Vill., Ltd. v. Unocal Corp., 270 F.3d 863, 882-83 (9th Cir. 2001); ABB Indus. Sys., Inc. v. Prime Tech., Inc., 120 F.3d 351, 358 (2d Cir. 1997); accord 4 WILLIAM H. RODGERS, JR., ENVIRONMENTAL LAW, HAZARDOUS WASTES & SUBSTANCES § 8.13, at 698 (1992) (stating that, with regard to the innocent landowner defense under CERCLA, "[t]he requirement that the property be acquired *after* the polluting event . . . has defeated a number of owners seeking refuge as innocents"). In fact, the innocent landowner defense under CERCLA requires a defendant to establish, in part, that "the real property on which the facility concerned is located was acquired by the defendant *after* the disposal or placement of the hazardous substance on, in, or at the facility." 42 U.S.C. § 9601(35)(A) (emphasis added).

Although MTCA does not contain this precise statutory language, it does state that, to qualify as an innocent purchaser, "an owner, past owner, or purchaser of a facility" must establish, in part, that "*at the time the facility was acquired by the person*, the person had no knowledge or reason to know that any hazardous substance . . . *was* released or disposed of on, in, or at the facility." Former RCW 70.105D.040(3)(b) (emphasis added). Accordingly, we interpret the innocent purchaser exclusion under MTCA to require a property owner to establish that no release or disposal of a hazardous substance took place while the person owned or operated the facility. See Grey, 158 Wn. App. at 847 (stating that "'the innocent purchaser defense applies only where . . . [liability] status results from *mere ownership*'" (emphasis added) (alterations in original) (quoting 24 TIMOTHY BUTLER & MATTHEW KING, WASHINGTON PRACTICE: ENVIRONMENTAL LAW AND PRACTICE § 15.2, at 93 (2d ed. 2007))).

The Association managed the common areas of the building when the dry cleaning business operated. During this time, the Association exercised control over the facility and, therefore, was an owner under MTCA. See former RCW 70.105D.020(22)(a) ("'Owner or operator' means . . . [a]ny person with any ownership interest in the facility *or who exercises any control over the facility*." (emphasis added)). Additionally, "[n]o evidence was presented as to the precise dates or years that the PCE was released, although there was no dispute that the PCE could have only been released during the years that the [dry cleaning business] operated, which was from 1961 until sometime between 1976 and 1978." Finding of Fact 27. Because the Association failed to establish that the release of a hazardous substance did not continue to occur while it managed the common areas of the facility, the Association failed to meet the requirements of the innocent purchaser exemption to liability.

trial court entered its order regarding each party's equitable share of liability. We disagree.

Under MTCA, "a person may bring a private right of action, including a claim for contribution or for declaratory relief, against any other person liable under RCW 70.105D.040 for the recovery of remedial action costs." Former RCW 70.105D.080 (1997), recodified as RCW 70A.305.080. In its findings of fact and conclusion of law regarding the liability of the parties, the trial court stated: "The parties are awarded their statutory fees and costs based on the foregoing allocation, and are directed to submit the same to this court within 14 days of this Order."

After the trial court denied without prejudice the Association's initial motion for fees and costs, the Association submitted a motion, attached with a declaration and exhibits, in which it requested remedial action costs. The Trust and John's Real Estate filed responses to the Association's requested fees and costs. Thereafter, the trial court entered an order in which it awarded the Association remedial action costs.

We have previously explained that, "if trial is to a jury, the determination of the amount of damages to which the plaintiff is entitled is within the jury's province." Jacob's Meadow, 139 Wn. App. at 760-61. As such, in the context of a jury trial, damages must be determined by the jury at trial, rather than by the judge after trial, because the jury is the fact-finder. Jacob's Meadow, 139 Wn. App. at 758-59.

24

However, when the judge serves as fact-finder, the trial court has broader discretion to both bifurcate the trial proceeding and determine the mode by which evidence is to be submitted by the parties. Indeed, trial courts are authorized to bifurcate a trial proceeding such that different issues may be adjudicated in separate proceedings:

> **Separate Trials.** The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, cross claim, counterclaim, or third party claim, or of any separate issue or of any number of claims, cross claims, counterclaims, third party claims, or issues, always preserving inviolate the right of trial by jury.

CR 42(b).

Under CR 42(b), "[t]he court may order . . . separate trials on its own motion, and the consent of the parties is not necessary." 10 DAVID E. BRESKIN, WASHINGTON PRACTICE: CIVIL PROCEDURE FORMS AND COMMENTARY § 42.1, at 358 (3d ed. 2000).

Furthermore, under Federal Rule of Civil Procedure 42(b), which is analogous to CR 42(b), a trial court is authorized

> "'in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy,' to order a separate trial of any 'claim, cross-claim, counter claim, or third-party claim, or of any separate issue or of any number of . . . issues' *as long as* the court preserves inviolate the right of trial by jury as declared by the Seventh Amendment or as given by a statute of the United States."

State of Ala. v. Blue Bird Body Co., 573 F.2d 309, 318 (5th Cir. 1978) (emphasis added) (quoting Fed. R. Civ. P. 42(b)).

25

No. 81987-9-I/26

Therefore, in order for issues to be bifurcated, "the issue to be tried must be so distinct and separable from the others that a trial of it alone may be had without injustice." Blue Bird Body Co., 573 F.2d at 318. "Such a rule is dictated for the very practical reason that if *separate juries* are allowed to pass on issues involving overlapping legal and factual questions the verdicts rendered *by each jury* could be inconsistent." Blue Bird Body Co., 573 F.2d at 318 (emphasis added); accord Sitton v. State Farm Mut. Auto. Ins. Co., 116 Wn. App. 245, 259, 63 P.3d 198 (2003) ("Bifurcation does not violate the Seventh Amendment unless the questions sought to be bifurcated are so interwoven that one cannot be submitted independently of the other without confusion and uncertainty.").

Here, the trial court bifurcated the trial proceeding with regard to the issues of liability and damages owed in the form of remedial action costs. It is well established that "[o]ne of the common uses of Rule 42 is bifurcation of the issues of liability and damages for separate trial." 10 BRESKIN, supra, at 359; see e.g., State v. Comcast Cable Commc'ns Mgmt., LLC, 16 Wn. App. 2d 664, 678, 482 P.3d 925 (2021); Sitton, 116 Wn. App. at 257. Additionally, because this case was tried as a bench trial, there was no concern that the trial court's determination of remedial action costs in a proceeding following its determination of each party's equitable share of liability would violate the Trust's right to a jury trial.

Indeed, our Supreme Court has explained that "[t]he trial court is generally in the best position to perceive and structure its own proceedings" and, therefore, it "has broad discretion to make a variety of trial management decisions,

26

No. 81987-9-I/27

[including] 'the mode and order of . . . presenting evidence.'" State v. Dye, 178 Wn.2d 541, 547, 309 P.3d 1192 (2013) (quoting ER 611(a)). In fact, ER 611(a) provides that trial courts have discretion over the mode and order of presenting evidence "so as to . . . make the . . . presentation effective for the ascertainment of the truth [and] . . . avoid needless consumption of time." ER 611(a).

Consistent with the trial court's broad discretion over the mode and order of presenting evidence, "an enactment of our first state legislature, now codified as a foundational provision of Title 2 RCW, provides the trial judge with the flexibility to authorize the particular procedure that—in the judge's estimation—best fits the needs of the case." Comcast Cable Commc'ns, 16 Wn. App. 2d at 684. This statute provides:

> When jurisdiction is, by the Constitution of this state, or by statute, conferred on a court or judicial officer all the means to carry it into effect are also given; and in the exercise of the jurisdiction, if the course of proceeding is not specifically pointed out by statute, *any suitable process or mode of proceeding may be adopted* which may appear most conformable to the spirit of the laws.

RCW 2.28.150 (emphasis added).

In the context of bench trials, trial courts properly have, depending on the particular needs of the case, ordered parties to submit proofs of damages after the trial court entered an order on liability. See, e.g., Wright v. Sheppard, 919 F.2d 665, 667 (11th Cir. 1990);[12] Tlacoapa v. Carregal, 386 F. Supp. 2d 362,

---

[12] In Wright, the trial court, during a bench trial, entered an order regarding liability wherein it "reserved ruling on compensatory damages and directed counsel to file 'proofs of past and anticipated future medical expenses and other damages.'" 919 F.2d at 667. Thereafter, the plaintiff "filed an affidavit with attachments." Wright, 919 F.2d at 667. The trial court subsequently entered an order wherein it awarded the plaintiff compensatory damages based on the affidavit and attachments that the plaintiff submitted. Wright, 919 F.2d at 667. On appeal, the order on damages was vacated because the appellate court determined that the plaintiff was entitled to additional awards of damages based, in part, on information contained within the

27

365-66, 367-68 (S.D.N.Y. 2005).[13]

Accordingly, the trial court did not err by authorizing the parties to prove remedial action costs through the submission of documentary evidence after the trial court entered its order on liability.

V

The Trust next asserts that the trial court erred by not ordering John's Real Estate to compensate the Trust for certain remedial action costs that were incurred by the Trust. In particular, the Trust contends that John's Real Estate was required to pay its equitable share of the costs incurred by the Trust for PGG's investigation of the contamination. We agree.

The term "remedial action" is defined as

> any action or expenditure consistent with the purposes of this chapter to identify, eliminate, or minimize any threat or potential threat posed by hazardous substances to human health or the environment including any investigative and monitoring activities with respect to any release or threatened release of a hazardous substance and any health assessments or health effects studies conducted in order to determine the risk or potential risk to human health.

Former RCW 70.105D.020(33) (2013), recodified as RCW 70A.305.020(33).

---

affidavit submitted by the plaintiff and that the trial court's order did not address. Wright, 919 F.2d at 669.

[13] In Tlacoapa, the trial court, during a bench trial, "found Defendant liable for unpaid wages and overtime, in violation of the [Fair Labor Standards Act]." 386 F. Supp. 2d at 365. The trial court explained that, "[a]t the conclusion of trial, the court ordered the Plaintiff to submit specific requests for damages . . . in order to facilitate the court's determination of appropriate damages." Tlacoapa, 386 F. Supp. 2d at 365. The trial court further explained that, "[a]s part of his post-trial submission, Plaintiff submitted a week-by-week analysis of Plaintiff's unpaid wages and overtime." Tlacoapa, 386 F. Supp. 2d at 367. The court then "adopt[ed] Plaintiff's calculation of unpaid wages and overtime" and awarded the plaintiff damages for the unpaid wages and overtime. Tlacoapa, 386 F. Supp. 2d at 368.

Our Supreme Court has clarified that, "[b]ased on the plain meaning of the statute, investigations of hazardous substances are remedial actions because their purpose is to 'discern whether such a threat exists.'" Douglass v. Shamrock Paving, Inc., 189 Wn.2d 733, 741, 406 P.3d 1155 (2017). Moreover, "[r]emedial action costs shall include reasonable attorneys' fees and expenses" and "[r]ecovery shall be based on such equitable factors as the court determines are appropriate." Former RCW 70.105D.080.

Before the trial court entered its findings of fact and conclusions of law on the issues regarding each party's equitable share of liability under MTCA, the Trust submitted proposed findings of fact and conclusions of law in which it requested the trial court to order John's Real Estate to pay its equitable share of the costs incurred by the Trust for the investigation conducted by PGG. The trial court's findings of fact and conclusions of law did not require John's Real Estate to pay its equitable share of these costs. Subsequently, the Trust filed a motion for reconsideration wherein it requested the trial court to order John's Real Estate to pay its equitable share of these costs. The trial court denied this motion.

John's Real Estate asserts that the trial court did not err by denying the Trust's requests for these remedial action costs because John's Real Estate had already paid the costs associated with the PGG investigation pursuant to a joint defense agreement. Not so. In fact, the joint defense agreement did not regard the costs incurred from the investigation conducted by PGG. Rather, as the trial court found, the joint defense agreement regarded costs incurred from a different

investigation, which was conducted by EPI in response to the claim filed by

Hadley:

> The overriding dispute on the Hadley claim was whether the contamination on the Thomas Center property had in fact spread to the Hadley property, and whether Hadley's remediation costs were legitimate and recoverable. To defend that claim, a "Joint Defense Group" made up of Pollock, the Trust, Association, and Johns, agreed to jointly retain Thom Morin at EPI. Each of those four parties paid roughly $106,000 to EPI for its joint defense of the Hadley claims. EPI performed testing and analysis to defend the Hadley claim.

Finding of Fact 13.

The investigation conducted by EPI was not the same as the investigation

conducted by PGG. Indeed, the trial court found that, "[p]rior to this litigation, . . .

the Trust hired Pacific Groundwater Group to determine whether the Thomas

Center property was contaminated, and with what substances" and, "[i]n April of

2015, PGG issued a report confirming the presence of PCE on site, and its likely

release from the dry cleaners." Finding of Fact 31.

John's Real Estate cites to testimony from Michael Hytopoulos, the trustee

of the Trust, in support of its argument that the joint defense agreement regarded

costs incurred from the PGG investigation. However, this testimony indicates

that the joint defense agreement regarded costs incurred from the investigation

conducted by EPI, not the investigation conducted by PGG:

> Q.    Exhibit 68. And can you explain what Exhibit 68 is, please?
> A.    It's a bill from PGG dated November 4th, 2019.
> Q.    And does this show an itemization of all the invoices the trust received from Pacific Groundwater Group?
> A.    That's correct. It should summarize all the charges since they've been engaged.

> Q. Okay. And was the total that's been charged here? Is it the 90,000 plus the 9,900 or so?
>
> A. Yes, sir.
>
> Q. Okay. So just right around $100,000?
>
> A. That's correct.
>
> Q. And has the trust paid Pacific Groundwater Group that full amount?
>
> A. Yes.
>
> Q. And is this -- this is for their investigations at the property?
>
> A. That's correct.
>
> Q. And as far as the joint defense group, same question there with EPI: They prepared various reports for the group?
>
> A. That's correct.
>
> Q. And then the costs of that were split between four different parties; is that right?
>
> A. That's correct.
>
> Q. And will you turn to Exhibit 69, please. Exhibit 69 . . . is this an itemization of all the bills from EPI split four ways between the association, The John's Company, the trust, and the Pollock estates?
>
> A. Therein lies the rub. It's hard to tell sometimes because they – their charges roll off as paid, so I know that the total should be somewhere in the neighborhood of 50-some thousand dollars per – per member of the joint defense. . . .
>
> . . . .
>
> Q. So this shows that the association and the trust have been billed $106,210; right?
>
> A. That's correct.
>
> Q. And the Pollock Estate and The John's Company have been billed 115,656?
>
> A. That's correct.

Accordingly, the trial court erred by denying the Trust's request for an award of an equitable share of remedial action costs from John's Real Estate for the investigation conducted by PGG.

VI

The Trust next contends that the trial court erred by not awarding it prevailing party attorney fees and costs under MTCA from John's Real Estate. Because the Trust was entitled to an award of remedial action costs from John's

31

Real Estate for the costs incurred from the investigation conducted by PGG, we agree.

"Whether a party is entitled to attorney fees is an issue of law which is reviewed de novo." Taliesen Corp. v. Razore Land Co., 135 Wn. App. 106, 141, 144 P.3d 1185 (2006). "Under the MTCA, the prevailing party in a private right of action 'shall recover its reasonable attorneys' fees and costs.'" Douglass, 189 Wn.2d at 744 (quoting former RCW 70.105D.080). "The 'prevailing party' is not defined, but the meaning is clear—the 'prevailing party' is the party that either recovers remedial action costs or successfully defends against a claim for such costs." Douglass, 189 Wn.2d at 744-45. "The recovery amount, or percentage recovered in comparison to the amount sought, is not dispositive to determine prevailing party status." Douglass, 189 Wn.2d at 745. As such, "prevailing party status depends on whether [a party] recovers his [or her] remedial action costs." Douglass, 189 Wn.2d at 745. "If [a] trial court awards remedial action cost recovery for at least some of [a party's] costs, [the party] will be the prevailing party, entitled to attorney fees." Douglass, 189 Wn.2d at 746.

As already explained, the trial court erred by denying the Trust's request that John's Real Estate pay its equitable share of the remedial action costs for the investigation conducted by PGG. Accordingly, on remand, the Trust is entitled to an award of reasonable attorney fees and costs from John's Real Estate for prevailing on this claim.[14]

---

[14] The Trust asserts that it is entitled to an award of attorney fees and costs under MTCA from John's Real Estate merely because the trial court found that John's Real Estate's equitable share of liability amounted to 14.65 percent. We reject this argument. Our Supreme Court has made clear that, under MTCA, a party is entitled to an award of attorney fees and costs if that

VII

The Trust, the Association, and John's Real Estate all request an award of attorney fees and costs on appeal pursuant to RAP 18.1 and RCW 70A.305.080. See Dash Point Vill. Assocs. v. Exxon Corp., 86 Wn. App. 596, 613 n.39, 937 P.2d 1148, 971 P.2d 57 (1997) (holding that prevailing party attorney fees and costs under MTCA apply to successful appellate actions).

Because the Trust was entitled to an award of remedial action costs from John's Real Estate, the Trust is entitled to an award of reasonable attorney fees and costs for prevailing against John's Real Estate on appeal. See Douglass, 189 Wn.2d at 744-45. The amount of this award is to be determined by the trial court on remand.

Additionally, the plain language of the indemnity clause covers attorney fees and costs incurred by the Trust both in the trial court and on appeal. Indeed, this clause provides that "the Lessees will save and hold the Lessor harmless from any and all damages, *costs*, *fees and expenses* or suits by public officials or private parties . . . on account of any business, use or occupation of the said premises or any part thereof." (Emphasis added.)

On remand, the Trust must establish the award of attorney fees that it is entitled to under the indemnity clause as an element of damages, the measure of

party "either recovers remedial action costs or successfully defends against a claim for such costs." Douglass, 189 Wn.2d at 744-45. Here, the trial court erred by denying the Trust's request for an award of remedial action costs from John's Real Estate for costs incurred as a result of the investigation conducted by PGG. These were the only remedial action costs that the Trust sought from John's Real Estate. Additionally, the Trust did not defend against any claim for remedial action costs from John's Real Estate. Therefore, it is solely because the Trust is entitled to an award of remedial action costs from John's Real Estate that the Trust is also entitled to an award of prevailing party attorney fees and costs from John's Real Estate under MTCA.

No. 81987-9-I/34

which must be determined by the trier of fact.  See Newport Yacht Basin, 168

Wn. App. at 102 ("[A]ttorney fees sought pursuant to a contractual indemnity

provision are an element of damages that must be proved to the trier of fact."

(citing Jacob's Meadow, 139 Wn. App. at 760)).[15]

## VIII

The trial court's ruling that the indemnity clause did not cover liability

arising under MTCA is reversed.  Because of the trial court's ruling on this issue,

the parties did not litigate whether the liability of the Association and John's Real

Estate is joint, several, or joint and several under the indemnity clause.  On

remand, the trial court must determine the extent of the obligations of both the

Association and John's Real Estate pursuant to the indemnity clause.

Additionally, the trial court's allocation of each party's equitable share of

liability under MTCA is vacated and, on remand, the trial court must determine

whether the parties' equitable shares of liability are impacted by the obligations of

the Association and John's Real Estate pursuant to the indemnity clause.[16]

---

[15] Because neither the Association nor John's Real Estate prevailed on appeal, we deny their requests for an award of attorney fees and costs.

[16] In calculating each party's equitable share of liability, the trial court considered the equitable factors set forth in Seattle Times Co. v. LeatherCare, Inc., 337 F. Supp. 3d 999, 1072-73 (W.D. Wash. 2018), which included as an equitable factor the existence of any indemnification agreement.  Indeed, the trial court stated that, in allocating liability among the parties, it specifically considered the existence of any indemnification agreement.  Finding of Fact 57. Therefore, on remand, the trial court must determine whether the parties' equitable shares of liability are impacted by the obligations of the Association and John's Real Estate under the indemnity clause.

Additionally, on remand, the trial court must determine whether the Trust's equitable share of liability is either set off or extinguished in light of the obligations of the Association and John's Real Estate under the indemnity clause.  Such a determination may impact whether the Trust is entitled to an additional award of prevailing party attorney fees and costs under MTCA. For example, if the Trust's equitable share of liability is extinguished by the obligations of the Association and John's Real Estate under the indemnity clause, then the Trust may be entitled to an award of prevailing party attorney fees and costs under MTCA.  See Douglass, 189 Wn.2d at 744-45 (stating that, under MTCA, "[t]he 'prevailing party' is not defined, but the meaning is clear—the 'prevailing party' is the party that either recovers remedial action costs *or successfully*

No. 81987-9-I/35

Furthermore, because of the Association's obligation to indemnify the Trust, the trial court's award of remedial action costs and attorney fees and costs to the Association is vacated and, on remand, any award of remedial action costs and prevailing party attorney fees and costs must be consistent with the obligations of the Association and John's Real Estate pursuant to the indemnity clause.

In addition, the trial court's order on the Trust's motion for reconsideration in which the Trust sought remedial action costs from John's Real Estate for the investigation conducted by PGG is reversed and remanded for a determination of the amount that the Trust is entitled to recover from John's Real Estate, including prevailing party attorney fees and costs and in light of the indemnification clause.

The trial court's ruling that the Association qualified for the third party exemption to liability under MTCA is affirmed. The trial court's order authorizing the parties to prove remedial action costs through the submission of documentary evidence after the trial court entered its order on liability is also affirmed.

Reversed in part, affirmed in part, and remanded for further proceedings consistent with this opinion.

_____

_defends against a claim for such costs_" (emphasis added)). However, because this issue was neither litigated in the trial court nor adequately briefed on appeal, we do not opine on it.

35

CONCUR: